is 16-6258, Mitchell v. Sharp. May it please the Court, Councilman Walpert, I'm John Carlson here this morning on behalf of Mr. Mitchell. I want to concentrate our discussion on the constitutionality of Oklahoma's heinous, atrocious, cruel, aggravating... Which we now understand to be a facial challenge, is that right? Yes, Your Honor. Okay, and to that point, you don't question that post Maynard v. Cartwright, at some point, Oklahoma had adopted a narrow... immediately, anyway, after Maynard v. Cartwright, Oklahoma adopted a narrow, constitutionally permissible, narrowing construction of that hack aggravator. I not only acknowledge that, I wrapped myself around that very period of time, from the decision by the Supreme Court in Cartwright, till about the end of the 90s. At all points in that time frame, the Oklahoma courts were appropriately limiting... Okay, well, now that you've wrapped yourself around that, what do you do with Bell v. Cone? Which suggests to us that we shouldn't, unless there is an affirmative indicator, to the contrary, we should believe that Oklahoma, and Oklahoma's affirmatively said they're pursuing their narrowing construction. Why should we do anything but accept that as being the truth? Because I am not challenging whether the OCCA, in this case, applied a limiting construction. It did. My contention is that it was an inadequate, insufficient limiting construction. And a constitutionally permissible one, which is different than, presumably, the one that they adopted right after Maynard v. Cartwright. Correct. Well, Oklahoma continues to believe that they're following the version they adopted after Maynard v. Cartwright, which leads to the fact that there needs to be an affirmative indicator that they have done something to the contrary through Bell v. Cone, right? I accept that as true. And here, let me give you the affirmative action that Cone looks for. It's in 2004, in DeRosa v. State, an OCCA case, in which the OCCA expressly rejected the very durational temporal element that this court in Medlock and Romano found implicit in those OCCA cases around which I embrace. DeRosa asked the OCCA to limit HAC to cases in which it asked the OCCA to exclude from the reach of HAC cases in which the victim experienced conscious suffering in that window of time that necessarily accompanies all murders. The OCCA said no, and it further gave the functional equivalent of the stiff arm to this court. It looked back at this court's decisions in Medlock and Romano and said, merely because that durational element satisfies the federal courts doesn't mean it satisfies this court. And I mark that decision as the beginning, as the derailment. In that decision, did the OCCA say we are departing from our view, from the narrowing construction that we adopted post Mayer v. Cartwright? No. Okay. Well, they didn't do that, so DeRosa could be a one-off inconsistency. And if it is an inconsistency, our grave, I think, is the case that says we're not supposed to be focusing on inconsistency with what the OCCA or any other state court does. Inconsistency won't cut it. Inconsistency, you're right, Your Honor, is inappropriate for you to consider within the realm of a due process 14th Amendment sufficiency challenge. And I don't offer that. However, it does not answer the question about Eighth Amendment compliance. And as for your point about DeRosa being a one-off, let me take you back 10 years earlier to Cheney v. State. The majority there in the OCC, the OCC majority, rejected Hack. The dissent criticized the majority for inventing a durational element and arguing that it didn't exist in Oklahoma law. That dissent, though, becomes the majority position in DeRosa. And so answering the Cone problem, which I acknowledge is a hurdle I have to get over. And it's a big one. If my decision, Mitchell 1 and 2, 2006 and 2010, followed DeRosa or come after DeRosa, we can infer that it followed DeRosa and rejected the durational element that this Court insisted be part of limited construction. Apart from what can be inferred, can you point to specific language in the OCCA's 2010 opinion where the Court is saying that it's not applying the narrowing construction? Because I thought the Court was saying that it was. So it seems to me that, I mean, I think I'm following your argument. But ultimately, you've got to point to something in that opinion to show us that the OCCA went off course somehow in terms of the narrowed construction. I haven't heard that yet. So can you say something about the actual OCCA opinion in 2010? The 2010 decision, Judge Matheson, essentially reprises the 2006 decision. 2010 says, this question about the constitutionality of HAC is raised judicata. We addressed it in Mitchell 2006. Mitchell 2006 applies a limiting construction. I accept that. So too does the Mitchell 2010. But both of those decisions follow DeRosa's rejection of the constitutionally required element. And so to satisfy the cone presumption, I rest largely on the calendar. If it happened after 2004, I think we can infer that the OCCA was rejecting the rational requirement. In other words, accepting the dissent decision from 1995 and turning that into the majority position in 2004. If that poured forward, the construction it's applying, and it is a construction, is unconstitutional. I interrupted you. No, no, I interrupted you. Sorry. Post-2004, it goes back to the point, why couldn't DeRosa just be in a one-off? I mean, why can we infer just from one decision? And there is a language in there that says, here, you know, we're rejecting our post-Maynard construction. And in your, I think, fourth supplemental brief in this case, we called upon you to do so. It's our fault. But in your fourth, in your footnote one, you didn't rely on this. You said Judge Hart's and his judicial harbingers, whatever those are. So are these the same judicial harbingers that he relied on? He does cite. I thought he relied on our cases, actually. Well, more prominent are the decisions that this circuit issued at the beginning of the 2000, Medlock-Romano, in which it either defined the approved limiting construction as requiring a durational element, or criticized the circuit, the OCCA, for moving away. Let me try, though, Your Honor, to sort of tackle this DeRosa as a one-off. What happens after DeRosa is conspicuously different from what happens before DeRosa. If you go back to State v. Brown, State v. Turrentine, State v. Battenfield, you will find the OCCA rejecting HAC in cases where the victim survives, quote, several minutes, a few minutes, loses consciousness rapidly, or the evidence is unclear about when consciousness was lost. Those, either that evidentiary uncertainty or the brief moment of conscious suffering that attends most murders were downs in the 90s to the benefit of the defendant. After DeRosa, no more. The only cases escaping HAC after DeRosa are those precious few in which the victim dies instantly. I challenge you to find a case after DeRosa where the victim lingers on, tragically suffering, briefly after receiving what is the fatal blow. You won't find those cases. Well, you're relying upon, to some extent, Judge Hart's pre-en banc decision in this case, right? Yes, to be very clear. The revised opinion. Yes, Your Honor. Okay. Well, in the revised opinion, there also was attendant to that a dissent by Judge Briscoe. And in that dissent, she goes on to explain Oklahoma case law and categorize it into categories that show that it is entirely consistent with Maynard v. Cartwright. And it is a principle situation of two situations where the doctrine, I think, wouldn't apply. And, well, I mean, it seems to me that, so how does that line up with your point that post DeRosa, we have this whole awash of cases that are constitutionally impermissible because they don't adhere to the narrowing construction? Well, with due respect to the former chief judge of the circuit, I think she's got the constitution wrong here. What she points to are cases in which the victim dies instantly. And for her, that's not a problem. For her, that is a principle justification for imposing the ultimate sanction. For her, that is an adequate way to comply with the Supreme Court's directive that an aggravating circumstance, quote, genuinely narrow the class of death-eligible persons. I disagree with her. Okay. Let's say that you disagree with that. But then the question comes, and this goes back to the Bell v. Kong presumption. Whether you agree with our esteemed colleague or not, you've got a judge of the court who's reading the law and says this is the way it is. Doesn't that raise a question as to whether there is an affirmative indicator out there that the OCCA has drifted? Yes. Worse still, Judge Briscoe is a fair-minded judge. But I think that she has mistaken the critical element of the Eighth Amendment here. She tolerates this distinction between instantaneous death and all others. But she's simply wrong on the frequency problem. Almost all murders in Oklahoma and elsewhere involve some brief moment of conscious suffering after the fatal blow. And if that's true, Judge Briscoe must be wrong, because if that's true, the aggravating circumstance is not doing the one thing it must do, and that's narrow the reach of the aggravator. So Judge Briscoe is a fair-minded judge, but she's made a mistake here. Judges Hartz and Kelly have got it right. Can I ask you sort of a preservation question? Please. There are a couple I could ask, but I'm going to focus now on the Eighth Amendment since we're talking about the Eighth Amendment. As it relates to that, when I go back and look at your briefing, it seems to me that it was attacking, it didn't talk about this drift that came out in Judge Hartz's opinion. In other words, it did focus on the notion that it was unconstitutionally vague, and that was language that was used both in the direct appeal and essentially cut-pasted into the habeas petition. But that's different, isn't it, than saying that, oh, yes, we acknowledge that it was at one time narrow, and now it has drifted down to the point where it's not constitutionally narrow. And the cases that were cited in both instances were Maynard and Godfrey. And Godfrey really involved a different situation, although it could provide some support, but involved a different situation than the one that you're alleging and the one that Judge Hartz alleged, which is a drift problem, which is different than Godfrey. I think, Judge Holm, you make a fair point. But I think you overlook the tolerance that the Supreme Court has for what you, I think, aptly call drift. The Supreme Court in Picard v. Connor, the seminal fair presentation case from 1972, calls it variation. I think I'm going to quote Picard. Despite some variation in the argument presented in the state court, the petitioner can fairly present the substance of his constitutional claim so long as the ultimate question for disposition remains the same. So I grant you, Judge Holm, there has been drift. Would that Mitchell's appellate lawyer in the OCCA framed it this way? It's a weakness, but I think I overcome it on two grounds. One is Picard's tolerance for variation in the legal theory. Two is a prior case that, Judge Holm, you know well, you wrestled with it in Grant, and it's United States v. Sanders. Sanders is not a fair presentation case, as you pointed out, in Grant v. Royal. It's a successor, 2255, but the question is analogous. The question there is, is this a new claim or an old claim? Sanders said, United States v. Sanders held that where there are doubts, the doubts would go to the benefit of the petitioner. And Picard cited Washington and those doubts and called it a, quote, ready example of a case in which, despite variation in the legal theory, the ultimate question presented in the state court is the same as that presented in the legal theory. There are no further? Oh, no, there are four more questions. I wanted 15 minutes. No, no, no, no. Well, let's talk preservation then as it relates to Hicks. The other claim in this case in which it seemed to me that the argument that is being made now clearly was not made to the district court. And so that's my first question. And if that's true, then aren't we under deference in determining how this Hicks case works out? On this point, I disagree with you. I do agree that the Hicks claim has some problems. Okay, it has some problems. I don't think standard of review is among them. The Hicks claim was inadvertently overlooked by the OCCA despite its presentation. But then Johnson becomes the case that we need to talk about now. It seems to me that we've got another presumption issue. And that presumption issue is that if Hicks was presented, and it was presented, we don't have to read through the tea leaves on Hicks. Hicks was presented to the OCCA. The OCCA acknowledged the Hicks claim. Whether it discussed it in its resolution of the matter, Johnson tells us the presumption is it did. And that you're going to have to come up with some reason to suggest that it did not. And if it did discuss it, well, I mean, if it did resolve it, absent discussion, then you are under a deference because it would have adjudicated the merits of that claim, right? I agree, assuming I accept the premise. I got it. So go back. Well, then tell me why I'm wrong. Well, I think Johnson carves out, illustrates instances in which the presumption applies. And it's cases where the defendant has barely mentioned the federal constitutional claim, or its resolution is sort of wrapped tightly around a federal presented claim, a federal constitutional claim. We don't have that here. We have a very distinct claim that Mr. Mitchell presented. And I agree, it is quite odd to read that first paragraph of the Hicks decision, which acknowledges that it's facing a Hicks claim. But then the next three or four paragraphs delve into the Brady claim. And I think the OCCA just made a mistake with hardly a war crime. It's got a busy document. But was it really presented as an independent claim? You say the Hicks argument is separate and independent of Brady in your supplemental briefing. But before the OCCA, wasn't Brady and Hicks sort of melded together? It wasn't really presented as a separate claim, was it? Well, I actually think if you read Mitchell's briefing, his primary argument was that it's a Hicks claim. Well, if it was so clearly presented that way, then why don't we back to the Johnson presumption? I guess I attribute this to the good faith mistake of the OCCA for seeing Hicks all over Mitchell's brief and just translating it into a Brady claim. How does that overcome the presumption? You're just speculating at this point that the OCCA, well, maybe they overlooked it, or maybe they didn't overlook it, and maybe in addressing the Brady claim, thought that they were addressing the Hicks claim. But the presumption goes against you. And so how are you overcoming it? Well, if it thought it was addressing Hicks in addressing Brady, it just made a legal mistake. Well, whether it made a mistake or not, why isn't that a decision on the merits subject to AEDPA review? Because I think it's far more likely, if you read the opinion, that begins with Hicks and then Hicks vanishes from the pages, that it just was inadvertently omitted by the OCCA. But even if that were your position, wouldn't you have had to have raised that with the district court here? I mean, in the district court, there was no argument about the standard of review in the first brief. And then when the government comes back, they're arguing at a deference. And in the reply, there's no attempt to take them on on that. Wouldn't you have had to do that, not to have forfeited your argument? I think it's a fair point. But Hicks was in the petition. It was argued. It was block copied. I accept that it wasn't a stellar case of lawyering. But I think the habeas lawyer did the bare minimum. I don't want to cut you short if you have other questions. You don't disagree with me that there was no argument to the district court that the review was not at a deference? Correct. There was not an explicit argument. That's fair. I accept that. Which, in my view, would be waiver. But let's move on from that to ask, assuming, and again, you don't have to accept this as being true, but assuming that you are under at the deference for the Hicks claim, what concerns me a little bit is it doesn't seem that you've made an argument on how you prevail under at the deference before us. In other words, we could end up with a very troubling prospect that if we do find that we're under at the deference, we have nothing from you to tell us why you should win. Your Honor, I think your point is an astute one, and it has partly informed a change in my position. I think if you reach Hicks that you take up the suggestion of the state, admittedly it's distant second choice, and that's certified, this question to the Oklahoma courts. The reason to do that is that I could overcome at the deference. Well, I was hoping for your natural eloquence in telling me why you could do that in your brief, and you didn't give it to me, right? Well, my problem in, well, you overstated my eloquence. My other problem is I'm forced to concede, I'm afraid, that there's some ambiguity in the Oklahoma law. Which would suggest that you could not prevail under at the deference. Correct. Unless we certify this and have the Oklahoma courts address the ambiguity, and if the courts, the Oklahoma courts, resolve the ambiguity in Mr. Mitchell's favor, then I believe I could overcome at the deference if I'm subject. Okay, let's go to the substance of Hicks. Isn't Hicks factually and legally distinguishable from what we have here? I mean, after all, in Hicks we end up with a sentencing statute that is held unconstitutional. The Supreme Court says you've got to go back and sentence. Jury has to sentence Hicks again. Here we're not dealing with an unconstitutional state statute. It wasn't so much that, Mr. Hicks, it wasn't a question of who was going to impose the sentence, it just so happened the jury was supposed to in his case, but it was that he had to be sentenced under a constitutional regime. Here, there's no contention that these Oklahoma statutes are unconstitutional. I'm just not understanding how Hicks even applies to this case. Can you help us with that? No, I'm assuming there's a, I'm not, let's assume for the sake of discussion that the same jury rule was violated here under state law. I'm still not seeing how Hicks gets you to the finish line. If you're relying on Hicks, I mean, you're relying on something more than Hicks for the due process argument? Because if you're relying on Hicks itself, it just seems like a very different case than this case. Well, I'm relying on the general principle of Hicks, which causes me a problem. Look, I'm just asking, how is Hicks, as a factual and legal matter, applicable to this case? Why isn't it inapposite to this case? Hicks stands for the proposition that when a clear state procedural requirement obtains and the state denies it for an arbitrary or for no reason, the defendant's fund rights to due process are violated, provided that right denied to him was fundamental. Doesn't Hicks also require a showing of prejudice? I believe there's a built-in prejudice component to Hicks, and I argue that Hicks agrees. So the answer is yes. Yes, but it's wrapped up with the merits. So there is a prejudice element. But if you agree that the state of Oklahoma denied a fundamental right to Mr. Mitchell, about which he had a substantial and legitimate expectation to receive, denying that right would be prejudicial. Well, how is it prejudiced if I did assume that this was an unbiased jury and that the prior jury would have been biased? That was the whole problem. They heard evidence they shouldn't have heard. So I have a hard time seeing any prejudice. You're accepting the Brecht standard, and I'm suggesting that in Hicks, Brecht doesn't apply. Are you saying it's structural? I'm suggesting something between structural and more to the point. It's sort of inherent in Hicks' analysis is a prejudice. But, counsel, in Hicks, the Supreme Court said, look, you've got to go back in sentence because it's likely that the 40-year sentence isn't going to be imposed. That's prejudice. I mean, what do we have here that's similar to that? That if they had to go back and assemble a new jury to have both a guilt and a punishment proceeding, where is the likely prejudice in not having done that along the lines of Hicks? Only in so far as he's been denied a fundamental right. But that wasn't what Hicks talked about when it talked about prejudice. The concern was in leaving the sentence intact. That likely prejudiced Mr. Hicks, because if you had applied the correct sentencing standard, it was very likely that the 40-year sentence was not going to happen again. But here, can you show that it's likely that he wouldn't have been convicted of the murder if you go back and have both a guilt and a you don't even address that? Well, I certainly do. In the final brief, I suggest that the prosecution's case would have been fundamentally different if it had been unmoored from the rape allegations that accompanied the first trial. And that perhaps if one juror might have found that the prosecutor's theory for the murder, which was he needed to eliminate a witness to the rape, would have disappeared. So that's your prejudice argument? If I'm forced to accept the Brecht standard. No, I'm not talking about the Brecht standard. I'm talking about the Hicks standard. Well, I believe your position is... I'm not taking a position. I'm just saying in Hicks, Hicks talked about prejudice. And it wasn't just talking about a procedure. It was talking about the fact that this 40-year sentence would stand unless you go back and do the resentencing under the correct standard. I think you make a fair point. I desperately want to reserve some time to talk, I hope, about hack on rebuttal. So unless there are further questions... Well, you'll get it. Thank you. Please, the court. I'm Jennifer Crabb, appearing on behalf of the respondent. I'd like to begin with the especially heinous, atrocious, or cruel aggravating circumstance. I believe Judge Holmes is correct that this argument that petitioner is currently making was not exhausted in state court. As this court said in the Donald Grant case, recitations of case law that are untethered to factual allegations or directed argumentation are not sufficient to exhaust a claim. Petitioner's argument in the Court of Criminal Appeals was a very brief, this court's aggravating circumstance is unconstitutionally vague, citation of relevant case law, did not make any indication that petitioner believed that the Court of Criminal Appeals had adopted a new definition, a new limiting definition of this aggravating circumstance. It could have led the Court of Criminal Appeals to easily reject it by saying we're adhering to Mayer Cartwright and those cases without knowing that there was some suggestion that they had done anything to the contrary. That's correct, Your Honor. And we did preserve that, our July 16, 2018 brief at pages two to three, which is in response to petitioner's brief after the amended Pavatt opinion came out. Not only is it unexhausted, it's actually incorrect. Yes, in 2004 in the DeRosa case, the Court of Criminal Appeals said we're not going to require the jury be instructed that there's a certain duration of suffering that has to accompany the murder. However, that has always been the Court of Criminal Appeals position. In 1994 in the Hooker case, which was actually also affirmed on sufficiency grounds by this court, it was a stabbing case. The victims could have lived anywhere from one to 10 minutes, but because there were defensive wounds and indications of a struggle, the Court of Criminal Appeals affirmed in that case. In 1995 in the Robinson case, it was a multiple gunshot wound case, and the court said that the absence of testimony regarding the amount of time that the victim was conscious was not dispositive. In 1995 in the Perry case, where the court reversed, they discussed what is it that makes the evidence sufficient for this aggravator and when is it not sufficient. They said we found it to be sufficient when there have been defensive wounds, admissions by the defendant that the victim was conscious, eyewitness testimony of consciousness, or medical evidence. It's insufficient where death was instantaneous, there was no evidence of which gunshot wound came first, or where the victim was unconscious. So they have been very clearly making this distinction, even in the mid-90s. The first time this court... The distinction being that if it's instantaneous, the hack aggravator will not be supported, but they will not require the jury to have evidence as to a specific duration. That is correct, Your Honor. The first time this court affirmed the limiting construction was in 1995 in the Hatch case, so that's a year after Hooker, and the same year as Robinson and Perry. In 1998, in Duvall v. Reynolds, this court again rejected a facial challenge to the aggravating circumstance and listed a lot of cases that the court had reviewed, comparing when the Court of Criminal Appeals had affirmed the aggravator and when it had reversed. In 1995, this court affirmed, on sufficiency grounds, not a facial challenge, in the Clayton v. Gibson case, where the victim was attacked at the front door and retreated to her bedroom. We know that because of a blood trail. Beyond that, the medical examiner could not tell the order of the wounds, and some of the wounds would have caused immediate unconsciousness. But it's that flight from the front door to her bedroom that was sufficient. Not only is that the position that the Court of Criminal Appeals has taken and that has been repeatedly affirmed by this court, it is the position of the United States Supreme Court as well. In Walton v. Arizona, Arizona defined cruel as including mental anguish, which includes a victim's uncertainty as to his ultimate fate. And they called this definition virtually identical to the one that they had approved, the torture or serious physical abuse in Cartwright. The dissent said, but wait a minute, Arizona has never required that there be a duration on this uncertainty. And the majority said nothing to that. On the same day, when the majority wrote Lewis v. Jeffers, they indicated that they had rejected the dissent's arguments in Walton. In Bell v. Cone, which was a per curiam opinion, the Tennessee Supreme Court, when discussing the aggravating circumstance, noted that the deaths were not instantaneous,  and the jury could consider the terror, fright, and horror of the helpless victims. So the question before the Supreme Court was whether the Tennessee Supreme Court had applied a constitutionally narrow aggravating circumstance. And because they did not do so expressly, the Supreme Court looked and said, well, this looks like the other cases in which they've affirmed where they have expressly applied the aggravator. And they said, which includes factors like attempts by the victim to resist, the deaths were not instantaneous, the victims' terror, fright, and horror, and then they said C, another case where the Tennessee Supreme Court had found the evidence insufficient because the death was instantaneous. And finally, they moved on and they said, and I quote, with respect to the meaning of torture, the court held the aggravator was not satisfied where the victim dies instantly, but that it was where the uncontradicted proof shows that the victim had defensive injuries, proving there was time for her to realize what was happening, to feel fear, and to try to protect herself. Accord, Cartwright, approving torture or serious physical abuse. So in light of the other Tennessee Supreme Court cases, the Supreme Court held that Tennessee was distinguishing these cases on a principled basis. There is simply no room, even if this court's review were de novo, but it's not, because Petitioner made no challenge in district court to the application of AEDPA deference, nor did he try to satisfy D1 or D2. And in this court, he makes only a contrary to argument, which must fail because the Supreme Court, the Court of Criminal Appeals does not have to cite Supreme Court case law. So under whatever standard of review, this proposition of error must fail. And on the not cite Supreme Court case law, I assume you're alluding to that part of Judge Hart's opinion and the opinion as well, I mean, the argument that's being made here that one indicator of the drift away from the constitutionally permissible instruction was that there was no analysis of Supreme Court case law. Is that what you're referring to? That is what I'm referring to, Your Honor. And I would just note that in the 2010 opinion, they did cite their 2006 opinion, which cited Lee, and Lee did a more extensive analysis, and Lee talked about Cartwright, Godfrey, and Tulapa versus California. If there are no further questions on that proposition, I'm ready to move on to the Hicks claim. If I understood counsel correctly, he admitted that there is ambiguity in this Oklahoma statute. If that is the case, then he cannot show that he had an entitlement to the same jury or that he was arbitrarily denied thereof. I would also point out that... What is your predicate for the saying, ambiguity does not equal ability to show those things? Because he has to show that he has a fundamental right that is established by this statute, and if the statute is ambiguous such that upon remand, the trial court could not have understood that he absolutely had to somehow re-empanel the original jury and then ensure that that original jury was not... The taint could be removed from the original jury. Where the statute is ambiguous, he could not have arbitrarily denied Petitioner that right because the right was, if it exists, which of course it doesn't, but if it did, it's so unclear that the trial court could not have arbitrarily denied it. What is the state's position on whether the Oklahoma statute did require the same jury? It does not, Your Honor. Because? Because. Because 701.10 begins upon conviction or adjudication of guilt. And albeit in a different context, the Court of Criminal Appeals has repeatedly referred to that as something like the triggering event. So the triggering event for same jury is the conviction. And this procedural statute is designed so that once the defendant is convicted, we don't have to re-empanel a new jury, we don't have to do voir dire again, we don't have to educate the sentencing jury on the crime for which they're sentencing the defendant. We simply keep that jury. We start right away on sentencing. And when you look at 701.10, which was enacted subsequently, you can tell what the legislature thought... Excuse me, when you look at 701.10a, you can tell what they meant by 701.10 because it says it begins notwithstanding subsection a of 701.10 of this title, which requires that the same jury sit in the sentencing phase of a capital murder trial. And then that statute closes with that this section should not be construed to amend 701.10, which requires the same jury to sit in both the guilt and sentencing phases of the original trial. And I would also point you to... Absolutely, yes. Does the fact that the Brady violation related to the guilt portion matter in terms of how that provision should be applied? It does not, Your Honor, because I think Petitioner conceded in his reply brief that there was also a Brady error made in second stage. And when this court originally reversed the sentence, it noted both that the state had incorporated first-stage evidence into the sentencing and that the prosecutor had argued rape within the sentencing phase of the trial. So what we have here is that there was a Brady error made in both stages of this trial, of the original trial, but it was only a prejudicial error in the second stage, which is why the statute permitted the petitioner to be resentenced at only a resentencing trial before I knew jury. How could it have only been a prejudicial error in the second stage when it was the basis to vacate convictions for the other crimes in the first stage? Sure. It was not prejudicial as to the murder in first stage, which is what petitioner was being sentenced for in the second stage. So that's how it was not prejudicial error in guilt stage. I agree it was as to the rape and the sodomy convictions. However, as to the murder, which is the conviction for which petitioner was sentenced, it was not prejudicial error in the first stage. In petitioner's reading of the statute too, aside from leading to absurd results requiring not only the technical, probably impossibility of getting these people back, I don't even know of any statute or any authority that would allow a trial court to call 12 particular people from the community as opposed to the typical random jury pool that we draw. I think what he's really arguing is you have to retry me on both stages with the same jury. He is, except that his reading of the statute is what gets him there. And his reading of the statute is if you do resentencing, you have to give me a new guilt phase as well. Or you have to give me the original jury. Well, it would be impossible to give you the original jury. And it would also be absurd to give you the original jury because, as you noted earlier, Your Honor, they were exposed to error. However, petitioner focuses on, in Section 1, it says if the court finds prejudicial error in the sentencing proceeding only. But if you continue to read, the very end of Section 1 says when a capital case is remanded after vacation of a death sentence, the prosecutor may, and then sub B says, move the trial court to impanel a new jury. And that's the first mention of new jury. So the statute says when a death sentence is vacated, you can impanel a new jury. And then it also says that no error in the sentencing proceeding shall result in the reversal of the conviction for a capital felony. But that is exactly what petitioner is asking for here. He's saying there was an error that caused my sentence to be reversed. And so you must give me a new guilt trial. The statute explicitly excludes that result. Even assuming that petitioner correctly understands the statute, Hicks certainly does not clearly establish the result that he seeks here. Could I ask you one more question? Of course. Statute. Specifically, I'm looking at 701, and I'm not sure this came up in argument, so if you don't have an answer, that's fine. But 701.13E2, which speaks to, let me find it here. E2, which speaks to, it says that in addition to the authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to set the sentence aside and remand the case for resentencing by the trial court. And this is in connection with death penalty review of sentence. Have you thought at all about how this interacts with your argument? And if not, that's fine. I think that I haven't given it any thought, Your Honor. I do think that that statute was amended because the Court of Criminal Appeals originally did not believe it had, I think the statute was worded differently, and the Court of Criminal Appeals believed that if it found sentencing error, its only option was to modify to life without parole. And so the statute was amended to give them the authority to do that. I think it does... I guess part of the question would be, it doesn't say anything about a new, having the same jury. It does not, Your Honor. And I think it does, in that way, support our argument that when you read these statutes as a whole, it's clear what they're doing, and we do have to, you have, this court has to construe them both to avoid absurd results, and also to be constitutional if that's possible. What they're doing is 701.10 says, as a matter of administrative convenience, this is how we do trials that end with sentencing. And then 701.10a is an exception, which says if the sentence has to be reversed, then we can impanel a new jury for that. And Petitioner forfeited any argument, or waived, as Judge Holmes would have it, any argument in district court that a DPA does not apply to this claim. And for that reason... Can you waive a standard of review? You can, Your Honor. In Hancock, it was this same question. The petitioner had not argued in district court that the Court of Criminal Appeals failed to reach the merits of his claim, and so this court found it to be forfeited, but same result, did not review it at all. Now, the state cannot waive the standard of review. This court has held that. I think it came up in Grant. It did, Your Honor. In Grant, I believe the argument had not been made in this court as well, and it was an argument that the dissent was making. Yes, absolutely. And the reason that it can be waived by the defendant is because it's his burden. Under ADPA, it's very clearly his burden to demonstrate that the state court's decision was contrary to the language of D2. And because it's his burden to do that, when he doesn't even make any attempt in front of the district court to do that, he's deprived the district court of the opportunity to explore that issue, and then he's raised it for the first time on appeal. Because we do have ADPA deference, the question is whether Hicks clearly establishes a right that would entitle petitioner to habeas relief, and it does not. In Hicks, there was, yes, a statutory right, but that statutory right was the right to have a jury. And the Court of Criminal Appeals arbitrarily denied the petitioner in that case that right because where the jury was instructed to give a 40-year mandatory sentence, they should have actually been instructed under a constitutional recidivism statute that the minimum was 10 years. And so the court said it was arbitrary for the Court of Criminal Appeals to merely say, well, but that was in the 40 years that the jury was instructed they had to give, was in this range of punishment. And so, you know, no harm, no foul here, where there was a fundamental right. It was conferred by statute, but it was still a fundamental right to have the jury decide his sentence. Here, what we have is, at best, an ambiguous statute, which petitioner says entitled him to the same jury. However, petitioner went through not one, but two rounds of resentencing without arguing, without objecting to the impaneling of a new jury. And in Hicks, didn't the Supreme Court note that, I mean, the consequences of getting a new jury, having a jury decide the issue, was not a mere formality. I mean, they noted that it was likely whatever the jury held, I mean, found, would be it. There would not be a sentence above that, right? So you combine that with the likelihood that the jury would reach a non-40-year sentence, that's pretty powerful substantive effect, right? It is, Your Honor, because the Court of Criminal Appeals does not have the authority to increase the sentence that the jury returns. And so that was absolutely part of their decision here, and petitioner cannot make that showing in this case. When you look at the Ross case and the Rivera v. Illinois case, the Supreme Court has made it really clear that there is no constitutional right to a particular composition of a jury, so long as the jury is fair and impartial, and petitioner has made no allegation that the jury here was not fair and impartial. And petitioner's primary argument, as it goes to prejudice, has been that, well, the prosecutor could not have used the same motive. If the prosecutor wasn't able to use the rape allegation, as they did in the first trial, then the motive for the murder would have been different. And I think counsel said today that the state would not have been able to argue the avoid-arrest aggravating circumstance, that Mitchell killed Miss Scott so that she could not testify against him for raping her. But the Court of Criminal Appeals expressly denied that in the 2006 opinion. In that case, at the first resentencing, the state had again relied on the rape allegation at resentencing. And the Court of Criminal Appeals, that was one of the reasons they reversed. They said, listen, without Joyce Gilchrist's testimony, there's no evidence of penetration. They said there may have been a rape, there may not have been a rape. We don't know, but we do agree that the state should not be allowed to argue the avoid-arrest aggravator based on a rape. However, they said the defendant doesn't contest, and we agree the state should be allowed to argue a sexual assault, an attempted rape, something along those lines. And, in fact, the state did so at the most recent resentencing. And so the motive didn't change. Miss Scott was still naked. Miss Scott still had bruising on her hips and her buttocks. Petitioner's semen was in her pubic hair. There's no question what the motive... Well, he had an explanation for that. It could have not been an assault, right? He said that he ejaculated and masturbated on her, right? He did. That's what he said. However, the issue here is whether the motive for the crime would have been different. Would the state, without the rape allegation, so the allegation of actual penetration, would that have changed their motive for the murder? Well, we know it wouldn't have because it didn't, because the state still made that argument at the second resentencing. And, again, she was... Yes, he said that he merely masturbated. Of course, that also implies a sexual motive in his assault. If he's being aroused by it, then there's also a sexual motive. But, in addition, she was naked, and she had bruises right above both hip bones. She had bruises on both wrists, which the state's reconstruction experts said were consistent with trying to restrain her for a sexual assault. It's actually what he had done with Maria Bustos, the 11-year-old that he had raped when he was 15. He held both of her wrists as well. And there were also bruises and scratches on her buttocks and her lower back. And so the evidence, although there may not have been sufficient evidence of penetration, the evidence that this was a sexually motivated crime is overwhelming. In which case, the petitioner cannot show prejudice. He... And I'll just briefly, as far as the murder conviction itself goes, the evidence was absolutely overwhelming. He had washed the blood off his shoes. He was seen there by Carolyn Ross immediately before she left. That was the supervisor who left... placed Mitchell there asking about the library, which is where the assault started. Petitioner admitted various degrees of involvement in the crime, but in his last statement to police, he actually admitted to being the one to strike the fatal blow with the coat rack. And then his presence of his DNA at the crime scene. So his evidence of the murder is absolutely overwhelming. And there is no prejudice because whatever jury, the same jury again or a new jury, would have convicted him of the murder. And then I've already spoken to the sentence. The motive would have been the same, excuse me, the especially heinous, atrocious or cruel aggravator. You know, we've been speaking of this in facial terms. Does their definition adequately narrow it? But when you look at what actually happened in this case, we have a prolonged assault with extreme suffering. Miss Scott was first attacked in the library. There's a drop of blood in one of her earrings and a sign that she was about to put up to close the gym in there. I mean, is that really relevant? What is that relevant to? It's relevant to whether he can establish prejudice on the sentencing of having the same jury versus the original jury. I'm just saying that the evidence is so overwhelming that the composition of the jury would reach the same result. Correct. I thought part of this, maybe I misunderstood, I thought part of this argument for prejudice stemmed from the notion that the jury may not have convicted the second time around. I think that there is a hint of that, Your Honor. And that's why I discussed the evidence of guilt. Yes. All right, got it. Petitioner cannot satisfy the AEDPA standard with respect to this claim. If the court does not have any further questions, I would ask you to affirm the decision of the district court. Ms. Carlson, since this is a death penalty case, I'm going to spot you two minutes. And Ms. Crabb, if he says anything that you feel you absolutely want to respond to, we can address that then. OK? Please. I'll start with the exhaustion question on the hack aggravator. I thought the state conceded exhaustion. I'm quoting from page 8 of its June 2018 brief here. Quote, on direct appeal, petitioner argued that the hack aggravator was the argument I'm making today. So I don't know. No, no, it isn't the argument you're making today. The argument you're making today is that there was a drift from the initial narrow construction that took place post Maynard versus Cartwright. The question is, would the OCCA have had a different response if they had heard that argument than the argument that it's unconstitutionally vague, C. Maynard, C. Godfrey? If I were the OCCA and I think it would have been a natural response, hey, we've already told you that it's not unconstitutionally vague. That's different than if you say, well, look, there's a record of your cases that show that you've drifted from that. Well, they would have given you a different answer, wouldn't they? Well, if you go back to those briefs, the body of the argument criticized the OCCA's, quote, attempt at narrowing the aggravator and faulted for failing to do that. So this was very clearly a narrowing claim. And that's what makes the aggravator facially unconstitutional. Because of course, there's no dispute that the bare language of the statute is unconstitutionally vague. The argument is whether the OCCA's limiting construction is equally vague. And I think given the card and given the tolerance for some variation, I think the question has been fairly presented, even if this exhaustion is not accepted or the concession is not accepted. Ms. Crabb, I think, makes a fair point. She marshals some pre-1990 cases with murder victims surviving a few minutes with uncertainty and arguably contrary to the point that I stressed early in the 90s. But what was more important is that when Judge Lucero wrote his opinion and concurrent opinion in Medlock, adopted then in Romano, Judge Lucero in Romano believed that this court must examine the durational quality of conscious physical suffering. So there may be. Bell versus Cohn says affirmative indicators. They are telling us we should scour our opinions for concurring opinions that cast doubt on what the OCCA is doing. That's an affirmative indicator? They've drifted from a narrow construction? Well, that concurrent opinion was cited and accepted. Oh, I love that concurring opinion. Well written. But that doesn't get us to affirmative indicators, does it? Well, that plus the fact of the drift from the cases that I've cited where they didn't survive and there was yet no act to the definitive rejection of that durational construction. OK, wrap it up. I think that's what's the critical element. Thank you. Please just submit it unless you have something you need to respond to. All right.